**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re: | ) |
| | ) Case No. 25-11733 (CJP) |
| Turtle Lane LLC, | ) |
| | ) Chapter 11 |
| Debtor. | ) |

**JOINT MOTION OF CITY OF NEWTON AND DEDHAM INSTITUTION FOR
SAVINGS FOR AN ORDER APPOINTING A CHAPTER 11 TRUSTEE**

The City of Newton (the "City") and Dedham Institution for Savings (the "Bank", and

together with the City, the "Movants") respectfully submit this motion (the "Motion") for entry of

an order, substantially in the form attached hereto as **Exhibit A**, appointing a chapter 11 trustee

under 11 U.S.C. § 1104(a).  In support of this Motion, the Movants submit contemporaneously

herewith the accompanying *Declaration of Anthony Ciccariello* ("Ciccariello Declaration"), and

refers the Court to the *Report of Custodian John C. Ottenberg, Former Receiver* (the "Receiver")

of Turtle Lane, LLC [Dkt. No. 42] (the "Receiver Report").  In support of this Motion, the Movants

respectfully state as follows:

**PRELIMINARY STATEMENT**

1.     The willingness of Congress "to leave a debtor in possession" of its business and

properties "is premised on an assurance that the officers and managing employees can be depended

upon to carry out the fiduciary responsibilities of a trustee." *CFTC v. Weintraub*, 471 U.S. 343,

355 (1985); *see* 11 U.S.C. § 1107(a).  A debtor's duty is to maximize the value of its estate and

distribute that value in accordance with the Bankruptcy Code—first to creditors and then, if any

value remains, to owners.  In carrying out those duties, a debtor-in-possession must act as a

fiduciary for its creditors and place those creditors' interests ahead of any personal interests.

2.     The rights of a debtor-in-possession, however, are not absolute and may be forfeited

if a debtor neglects its fiduciary duties. *In re Morningstar Marketplace, Ltd.*, 544 B.R. 297, 303

324802210v4

(Bankr. M.D. Pa. 2016).  Moreover, when a debtor-in-possession is incapable of discharging the fiduciary duties of a trustee, the Bankruptcy Code "commands that the stewardship of the reorganization effort must be turned over to an independent trustee." *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989); *see also In re Spenlinhauer*, 13-17191-JNF, 2017 WL 1098820, *4 (D. Mass. Mar. 23, 2017) ("[T]he appointment of a trustee is a power which is critical for the court to exercise in order to preserve the integrity of the bankruptcy process and to insure that the interests of creditors are served.").  Under § 1104(a)(1), "the court shall order the appointment of a trustee" for "cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor . . . or similar cause." Examples of "cause" include "conflicts of interest, including inappropriate relations between corporate parents and the subsidiaries; misuse of assets and funds; inadequate record keeping and reporting; . . . fraud or dishonesty; and lack of credibility and creditor confidence." *In re Ashley River Consulting, LLC*, No. 14-13406 (MG) 2015 WL 1540941, at *9 (Bankr. S.D.N.Y. Mar. 31, 2015).  Indeed, prepetition conduct alone is sufficient to warrant the appointment of a trustee.  *See In re Rivermeadows Assoc., Ltd.*, 158 B.R. 615, 619 (Bankr. D. Wyo. 1998) (holding "the Code is clear that the prepetition conduct of the debtor's management may be the sole deciding factor" in the appointment of a Chapter 11 trustee); *see also Savino Oil*, 99 B.R. at 526 (noting "[t]his prepetition course of conduct, in and of itself, constitutes 'cause' for the appointment of a Chapter 11 trustee").

3.      Furthermore, when such dilatory, pre-petition conduct of a debtor is perpetuated by equally dismissive post-petition incompetence and inadequate disclosures—such as failing to maintain and preserve the Property, maintain business records or mitigate hundreds of Building Code and City Ordinance safety violations—and where no reasonable likelihood exists for any

2

reorganization or even a liquidation that could benefit unsecured creditors, a trustee must be appointed.

4.      If there ever were a case for the appointment of an independent trustee, it is this one. The Debtor has demonstrated a total lack of regard for city and state building ordinances and codes, and in doing so, has created a structure that is unsafe and dangerous to life and limb. Despite the City's repeated notices and fines and the involvement of state agencies, a state court and a receiver, the Debtor has refused to take the steps necessary to fix its own mess.  This is a matter of health and safety for the City, and an independent trustee is urgently needed.

5.      Moreover, the Court should appoint a trustee under § 1104(a)(2), which commands that the Court "shall" appoint a trustee "if [it] is in the interests of creditors."  All of the factors courts assess under § 1104(a)(2) are present here.  The Debtor's lack of transparency, trustworthiness and reliance on a patently unfeasible and unconfirmable plan have nullified any confidence the Movants, as two of the Debtor's largest creditors, holding greater than 99% percent of the debt, ever had in the Debtor to effectively reorganize or even liquidate its sole asset, which has no equity, and which is not only deteriorating but remains in jeopardy of causing harm to the general public and justifies the appointment of a Chapter 11 trustee.

6.      Finally, the Movants have no confidence in the Debtor's willingness or ability to steer this case to a successful conclusion, let alone achieve an outcome that benefits all stakeholders.  Indeed, the grounds for this Motion include: (a) the Debtor's pre-petition and continued post-petition failure to address and eradicate more than 250 pre-existing Building Code and City Ordinance (both defined below) violations rendering the Property (defined below) not only unsafe, but also leaving it in a hazardous, unprotected, and deteriorated condition with no funds available to remediate and no development or funding alternatives; (b) the Debtor's

324802210v4

delinquency in submitting its first three months of required Monthly Operating Reports ("MOR"), with its last report (for November) evidencing (i) less than $1,500.00 in its Debtor-in-Possession account and no accounts receivable, and (ii) less than $5,500.00 in total disbursements despite anticipated post-petition insurance premiums, utilities and real estate tax obligations aggregating in excess of its cash on hand; (c) a patently unconfirmable plan[1] in a proceeding that the City and Bank contend is a single asset real estate debtor, now in its seventh month;[2] (d) a lack of equity in the Property; (e) the Debtor's failure to maintain adequate books and records or to have timely filed tax returns since 2014; and (f) the Debtor's failure to schedule, disclose, acknowledge or attribute any validity to an independent appraisal conducted by the Receiver,[3] yet provided no valuation under oath in its Schedules.

7.    A neutral and independent trustee is needed to "insulate the reorganization process from paralytic conflict," reduce the estate's administrative expenses, and finally "foster the negotiations between interested parties which generally occurs in bankruptcy cases." *In re Bellevue Place Assocs.*, 171 B.R. 615, 625 (Bankr. N.D. Ill. 1994); *Savino Oil*, 99 B.R. at 527 n.11.

## JURISDICTION AND VENUE

8.    The United States Bankruptcy Court for the District of Massachusetts (the "Court") has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper under 28 U.S.C. §§ 1408 and 1409.

---

[1] Indeed, the First Amended Plan of Reorganization [Doc. No. 75] is predicated solely on a sale of the Property for which no offer has been presented after four months of marketing by a residential broker.

[2] As noted below, on December 23, 2025, the Bank filed a Motion to Designate Debtor as Single Asset Real Estate Debtor [Doc. No. 60] and on December 23, 2025 the City filed a Joinder [Doc. No. 65], which Motion is pending with the Court and which the Debtor filed an opposition on January 6, 2026 [Doc. No. 70].

[3] A report which the Debtor had, in fact, received from the Receiver but denied its receipt at the section 341 meeting.

324802210v4

9.      The statutory bases for the relief requested herein are sections 1104 and 1112 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules").

## BACKGROUND

### A.      The Debtor's Initial Operations.

10.      Prior to the Petition Date (defined below), the Debtor "operated" as a purported real estate developer but was as neglectful in its development as it was in failing to maintain and preserve records, file tax returns, or observe corporate reporting formalities.  Donna Vona and her husband Stephen Vona serve as the Debtor's manager and real estate developer, respectively.  The Debtor purchased real property at 283 Melrose Avenue, Newton, Massachusetts (the "Property" or "Project") with the purported intention of redeveloping the Property.  The Project consists primarily of a three-story, sixteen-unit modular building, that remain in its partially constructed, unimproved and perilous state of deterioration.

11.      The Debtor financed the acquisition and development of the Property with advances from the Bank, pursuant to two promissory notes and two senior mortgages as specified in (a) the Bank's pending *Motion for Relief from the Automatic Stay Pursuant to 11 U.S.C. §362(d) Regarding Commercial Real Property Located at 283 Melrose Street, Newton, Massachusetts* [Docket No. 24] (the "Stay Relief Motion"), and (b) the Bank's Motion to Designate Debtor as Single Asset Real Estate [Docket No. 60] ("Motion to Designate"), each followed by a Joinder by the City [Docket Nos. 33 and 65].[4]

---

[4] Incredibly, the Debtor filed an Opposition to the Motion to Designate, (albeit noted as an Opposition to the Automatic Stay) [Docket  No. 70], claiming the Property had once included a theater and office building.  However, such disingenuous assertions by the Debtor are flatly contradicted, as for years, (a) the theater sat unfinished and shuttered while construction progress of the office building stalled after the installation of its foundation prior to the Petition Date, and (b) there is no intention on behalf of the Debtor to rebuild either.  Equally disingenuous is that the Debtor's valuation in its First Amended Disclosure Statement, albeit unsubstantiated, is based upon marketing the Property as a residential development.

324802210v4

12.     The Project and the Debtor's operations thereon were, and continue to be, subject to the Massachusetts State Building Code (the "Building Code"), as well as Zoning Ordinances specific to the City of Newton (the "City Ordinances"), of which the Debtor has been and continues to be in violation.

**B.     The Debtor's Repeated Violations of the Building Code and City Ordinances.**

13.     The Debtor began construction in earnest in 2021.  Throughout the entirety of the Debtor's construction on the Project, the Debtor failed to comply with building requirements set forth in both the Building Code and the City Ordinances.[5]  For example, in early August of 2021, over multiple days, the Debtor installed modular units on the Property without obtaining a building permit to do so.  The units were installed on top of steel framing and a concrete deck that were also installed without a building permit, and a foundation that had not been inspected or signed off on by the City's building officials.  The City immediately ordered the Debtor to stop construction, but the Debtor repeatedly ignored the City's directives.

14.     On August 9, 2021, the City issued a Stop Work Order and Violation Notice to the Debtor, identifying certain violations existing under the Building Code (the "August 2021 Notice"). The Debtor continued to undertake construction work despite its receipt of the August 2021 Notice.

15.     On October 1, 2021, the City issued a second Stop Work Order and Violation Notice to the Debtor, identifying certain additional violations existing under the City Code.

16.     On December 16, 2021, the City issued the Debtor a letter detailing the structural and safety concerns that needed to be addressed. The Debtor failed to address the City's critical concerns.

---

[5] More detailed explanations of each of the violations identified herein are provided in the City's Proof of Claim (defined herein).  *See* Claim No. 2.

6

324802210v4

17.    On July 5, 2022, the City issued a Notice of Unsafe Structure to the Debtor, pursuant to G.L. c. 143, that found the Project unsafe and dangerous to life and limb.  After issuance of this notice, the Newton Fire Department marked the Project with an "X" in accordance with G.L. c. 143, the Building Code and the State Fire Code, as notice of a dangerous condition.

18.    On July 6, 2022, the Citty issued a notice ordering that the Debtor cease and desist from further construction activity until a building permit for the unpermitted work was obtained.

19.    On August 3, 2022, the City issued a letter to the Debtor detailing all submissions required from the Debtor to obtain a building permit.

20.    On October 31, 2022, the City issued a letter to the Debtor's attorney that further clarified the Project deficiencies and Building Code violations and the required remediation steps that the Debtor needed to undertake.

21.    Between August 2023 and March 2024, the City issued four letters to the Debtor addressing required remediation actions.  The Debtor failed to take those actions.

22.    On March 25, 2024, the City issued a Final Demand and Notice of Further State Building Code Violations, which identified (i) all fines accrued under the previous notices amounted to $6,976,900.00 as of March 25, 2024, (ii) fines would accrue for each day that the violations identified therein continued, and (iii) the Property incurred additional violations that needed to be rectified.  This final demand letter further identified that fines would continue to accrue that each day the violations were not cured, and that each day the violations were not cured constituted a separate offence under the Building Code and City Ordinances.

23.    On April 11, 2024, the City's Department of Health and Human Services issued a Correction Order to the Debtor for violations under the State Sanitary Code regarding mold.  As

324802210v4

of the date of filing this Motion, the Debtor has not rectified or remedied, among other violations, the mold problem.[6]

24.     On April 26, 2024, the City issued a letter to the Debtor listing the actions needed to make the Project safe and complete construction in compliance with all building requirements. The City also issued a second Unsafe Structure Notice regarding specific conditions that the Newton Fire Department deemed unsafe and dangerous to life and limb and that required immediate action from the Debtor.

25.     After the Debtor failed to take the action required by the April 26, 2024 Unsafe Structure Notice, the City, under the authority of G.L. c. 143, performed a Board of Survey inspection.  On June 10, 2024, the City issued a Board of Survey Report to the Debtor, which detailed the actions required by the Debtor to address the unsafe conditions.

**C.     The Involvement of State Agencies and State Court.**

26.     In 2022, the Debtor filed an appeal with the Massachusetts Building Code Appeals Board (the "BCAB"), challenging the City's July 6, 2022 notice that ordered the Debtor to cease and desist all unpermitted construction activity until it obtained a building permit.  On October 25, 2022, BCAB issued a decision denying the Debtor's appeal and affirming the City's order that all construction work cease until the issuance of a building permit.

27.     On August 17, 2022, the Massachusetts Division of Occupational Leisure's ("DOL") Office of Public Safety and Inspections ("OPSI") filed a complaint with the Massachusetts Board of Building Regulations and Standards ("BBRS") against Stephen Vona for

---

[6] Notably, the Debtor's Schedules and MOR's evidence no meaningful funds or income.  Moreover, the Debtor's *Expedited Motion to Approve Debtor-in-Possession Financing and for Related Relief* [Docket No. 34] (the "Financing Motion") allocates no monies for mold remediation.  Finally, only approximately $5,500.00 has been advanced to the Debtor and even that amount appears to be woefully insufficient to meet the obligations the Financing Motion identifies, including real estate taxes.

324802210v4

his failure to properly supervise construction of the Project.  The BBRS issued a decision which noted that the evidence it reviewed "inspires little confidence that [Vona] should, ever again, be involved in any capacity in multi-family construction . . . ."  Despite both the Debtor and Stephen Vona signing a stipulation in the state court Receivership Action (defined below) acknowledging the BBRS decision, the Debtor specifically denied this allegation.  *See* Docket No. 37, pg. 1.

28.     On June 25, 2024, upon motion of the Bank, the Middlesex Superior Court ordered John Ottenberg, as receiver (the "Receiver"), to take over possession and control of the Project from the Debtor because of its failures to comply with the Building Code and complete the Project. *See Dedham Institution of Savings v. Turtle Lane, LLC et al.*, Docket No. 2381CV01807 (the "Receivership Action").  The Superior Court Order found that "Turtle Lane has failed to comply with numerous building code, zoning requirements, and other legal requirements for the Project and is subject to numerous violations orders, stop work orders, and fines" and that the Project "is subject to 'stop work' orders from the City of Newton, due to numerous construction defects."

29.     The Receiver expended approximately $135,000.00 to evaluate, assess and articulate the numerous deficiencies and damage caused by the Debtor to the Property.  On December 17, 2024, the Receiver submitted a 72-page document entitled "Assessment of Building Code Deficiencies/Noncompliant Issues and Corrective Plan" to the City and the OPSI. The Receiver noted 277 separate Building Code deficiencies and noncompliant issues, which included those identified in each of the City's prior notices and letters.

30.     Despite the City's efforts—as well as the efforts of multiple state agencies, the state court, and the Receiver—the Debtor never took the necessary steps to remedy the outstanding Building Code violations, and the Project remains uncompleted and unprotected.

9

324802210v4

31.     Accordingly, on August 21, 2025 the Bank proceeded with its foreclosure of the Property.

**D.     The Bankruptcy Case.**

32.     On August 21, 2025 (the "Petition Date"), the Debtor filed a petition in this Court seeking relief under chapter 11 of the Bankruptcy Code, just before commencement of the Bank's foreclosure auction, thereby stopping the foreclosure and terminating the Receivership.

33.     The Debtor has been managed by Donna Vona with "assistance" of her non-member spouse Stephen Vona, the purported general contractor who not only failed in his efforts to develop the Debtor's real estate having caused hundreds of Building Code and Building Ordinance violations but also was the "general contractor" of another failed real estate development, known as Farwell on the Charles, LLC ("Farwell on the Charles"), with Donna Vona as a member.[7]

34.     On September 29, 2025, the Bank filed the Stay Relief Motion to pursue its rights and remedies under its loan documents, including but not limited to pursuing its foreclosure sale of the Property.  *See* Docket No. 24.  The City filed a Joinder to the Stay Relief Motion [Docket No. 33], and the Court held a hearing on October 23, 2025.  Following the hearing, the Bank and the Debtor engaged in discussions regarding evidentiary issues in connection with the Stay Relief Motion, as the Debtor challenged the recent independent valuation of the Property that had been obtained by the Receiver.[8]  The appraisal (and supplemental appraisal) was emailed by the Receiver to counsel to the Debtor in the Receivership Action as well as to Stephen Vona.

---

[7] Farwell on the Charles recently filed a Chapter 7 case (Case No. 25-12029 (JEB)), which its Chapter 7 trustee, Joseph Butler, promptly closed as a no asset case.

[8] Ignoring an actual recent appraisal in its possession, the Debtor instead listed the valuation of the Property on its Schedules as "undetermined" and thereafter denied under oath at the section 341 meeting that neither the Debtor nor Stephen Vona received the appraisal (and supplemental appraisal).

10

324802210v4

35.     On November 18, 2025, the Debtor filed its *Chapter 11 Plan of Reorganization* [Docket No. 52] (the "Plan") and its *Disclosure Statement* [Docket No. 52] (the "Disclosure Statement").  Each of the Bank and the City filed an objection to the Disclosure Statement [Docket Nos. 62 and 64, respectively], as did the United Strate Trustee [Doc. No. 63].

36.     Accordingly, on January 21, 2026, the Debtor filed its *First Amended Plan of Reorganization of Debtor and Debtor-in-Possession* [Dkt. No. 75] (the "Amended Plan") and the *First Amended Disclosure Statement with Respect to Plan of Reorganization* [Dkt. No. 77] (the "Amended Disclosure Statement").  The Amended Disclosure Statement includes significant detail regarding the history between the Debtor and the City, though such statements are directly contradicted by (1) the supported assertions in the City's Proof of Claim (defined herein); (2) the Motion for Stay Relief; and (3) the Bank's Objection to the Debtor's Disclosure Statement.

37.     The sole funding source for the proposed Plan is the sale of the Property. *See* Amended Plan, § 5.1.

38.     On January 23, 2026, the City filed a proof of claim [Claim No. 2] (the "Proof of Claim"), asserting $14,420,100.00 owing by the Debtor on account of the various violations that were never remedied.  Importantly, the amounts owing to the City continue to accrue each day that the violations remain uncorrected.

**E.     The Condition of the Property is Deteriorating Post-Petition.**

39.     On or around December 4, 2025, a major portion of the protective fence surrounding the Project constructed by the Receiver to protect the Project from causing endangerment to the public and preventing criminal access to the Property was removed.  As the Property contains copper, plumbing fixtures and electrical boxes there is not only the danger posed by any exposed construction site to neighbors and their children, but further jeopardizes the value to the items stored at the site.  As the protective fence was required in order for the Receiver to

11

324802210v4

obtain insurance for the Property, the Property is now further imperiled with either repairing the fence or the alternative of a massive increase in premiums being cost prohibitive, as the Debtor has insufficient funds for either based on its MOR's. Additionally, the Receiver has been receiving shut-off notices from Eversource Energy regarding at least one of the two sources providing electrical power to the Property.

### F. The Debtor's Lack of Candor, Mismanagement of the Property, and Conflict of Interest.

40. Both prior to and after the Petition Date, the Debtor has been grossly mismanaged and deceitful in court pleadings. First, at the time of the Receiver's appointment, the Debtor lacked corporate existence, had been administratively dissolved on December 29, 2023, and its last Annual Report had been filed on February 22, 2021. It was reinstated *by the Receiver* on August 6, 2024. Donna Vona, as manager, had failed to file timely documents maintaining the corporate existence of the Debtor. Moreover, at the time of the Petition Date, the Debtor had failed to file any tax returns since its inception in 2014—meaning, taxes were delinquent for *more than a decade*.

41. According to the Receiver, the Debtor informed him that the Debtor never maintained any financial ledgers, and only a spare number of documents were turned over by the Debtor to the Receiver. Moreover, Donna Vona only had in her possession, as Debtor's manager, of less than half of the Debtor's bank statements.

42. Having failed to maintain financial books and records, Donna Vona as manager, has demonstrated a lack of candor to the creditors and to the Court when under oath she claimed to be unable to complete its Schedules and Statement of Financial Affairs accurately, as it has limited access to its book and records, thus attempting to mislead the Court that the Receiver or

12

324802210v4

others had possession of "books and records". *See, e.g.*, Docket No. 15, Schedules A through H, pg. 2.

43.     Donna Vona, as Debtor's manager, was also less than candid at the section 341 meeting on September 26, 2025 when she stated that she was not in the "possession" of a recent appraisal or other valuation of the Property.  As noted earlier, Donna Vona knew full well that the Receiver had commissioned an appraisal from Lane Valuation Group and the Debtor's counsel, as well as Stephen Vona, as evidenced by a signed Stipulation and Confidentiality Agreement regarding the appraisal dated February 27,2025.  Indeed, it defies logic that the Debtor's manager would not have access to that appraisal (and supplemental appraisal) as well as cost estimates and should have at least been transparent that there was a recent appraisal but subject to a confidentially agreement.  Instead the schedules valued the Property as "undermined," and there is no reference to the existence of any appraisal in the Debtor's Disclosure Statement [Docket No. 53] or First Amended Disclosure Statement [Docket No. 77].

44.     Also absent from Debtor's Summary of Liabilities and the three MOR's collectively filed on February 11, 2026 are the claims of the City.  These fines are based on construction related violations caused by Stephen Vona, who, among other issues, served as the Debtor's general contractor despite lacking a construction supervisor's license from September 19, 2019 (when it expired) until October 15, 2021.

45.     When the Receiver was appointed, he noticed that substantial water damage had occurred under the supervision of Stepen Vona and then later learned that there were numerous dangerous impediments and structural issues in Stephen Vona's attempted construction of the Project which construction commenced despite the absence of a building permit; in fact, a building permit on certain work had never been obtained.  Despite these mandated prohibitions, Donna

13

324802210v4

Vona, as manager, and Stephen Vona as general contractor, allowed the subcontractors to work without a permit or a license, and without liability insurance.

46.     Before the Receiver was appointed, further damage was caused to the Project's existing structure and construction fell far short of applicable standards and quality.   Not surprisingly, the City found numerous issues, including substandard and faulty construction, and its findings are set forth in the various notices issued by the City and summarized in a June 3, 2024 Survey Report (prior to Receiver's appointment), which included observations by and information obtained from an independent architect.  *See* Docket No. 42, Ex. B.  If accurate, then the potential damages arising from the cost to correct the substandard or illegal actions of Stephen Vona on the Debtor's behalf creates a conflict of interest for the Debtor's manager from making demand or suing Stephen Vona for breach of contract and/or negligence, which constitutes further grounds for the appointment of a trustee.

47.     The Receiver has further reported that Stephen Vona admitted that more than $350,000 of the Debtor's funds were diverted to Farwell on the Charles.  Curiously, Farwell on the Charles has no records of whether the funds were invested or loaned, or whether there were guarantees provided to the Debtor for the funds.

**<u>ARGUMENT</u>**

48.     "The point of bankruptcy is to marshal assets in a way that maximizes their value for the benefit, primarily, of creditors, and then once creditors are paid, for owners." *In re Futterman*, 584 B.R. 609, 618 (Bankr. S.D.N.Y. 2018). A debtor's duty is to maximize the value of its estate and to distribute the estate's property in a manner that is consistent with the Bankruptcy Code's priorities.  *See In re Smart World Techs. LLC*, 423 F. 3d 166, 175 (2d Cir. 2005) (noting debtor's "fiduciary duty" to estate).

324802210v4

49.     "The willingness of Congress to leave a debtor-in-possession is premised on an expectation that current management can be depended upon to carry out the fiduciary responsibilities of a trustee." *Savino Oil*, 99 B.R. at 526; *see also* 11 U.S.C. § 1107(a) ("a debtor in possession . . . shall perform all the functions and duties . . . of a trustee"). Accordingly, "[w]hen a debtor remains in possession of his bankruptcy estate, he possesses most of the rights, powers, and duties of a trustee." *Spenlinhauer*, 2017 WL 1098820 at *3.

50.     A debtor's essential fiduciary duty is to maximize the value of the estate for the benefit of its creditors. That duty includes the obligations to

> "a) protect and conserve estate property for the benefit of creditors (including a duty to avoid self-dealing and to investigate and prosecute warranted avoidance actions); b) avoid damaging the estate; and c) refrain from acting in a manner that could hinder a successful reorganization."

*In re Sillerman*, 605 B.R. 631, 648 (Bankr. S.D.N.Y. 2019) (citations omitted).

51.     As the First Circuit Bankruptcy Appellate Panel recognized, section 1104 of the Bankruptcy Code provides a remedy when a debtor fails to maximize the value of the estate.

> The appropriateness of the decision to appoint a reorganization trustee under Bankruptcy Code [section 1104] turns upon whether there was a sufficient showing of cause, including incompetence or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or, in the alternative, a showing that the appointment would be in the best interests of the creditors and the estate.

*In re Garland Corp.*, 6 B.R. 456, (B.A.P. 1st Cir. 1980).

52.     Section 1104(a) of the Bankruptcy Code thus provides for the appointment of an independent trustee for either of two reasons. Under § 1104(a)(1), "the court *shall* order the appointment of a trustee . . . for cause." Under § 1104(a)(2), even in the absence of "cause," the court "shall" appoint a trustee "if such appointment is in the interests of creditors." As set forth below, appointment of a trustee is required under both of those grounds.

15

## I.     The Court Should Appoint a Chapter 11 Trustee for Cause Under § 1104(a)(1).

53.     Section 1104(a)(1) of the Bankruptcy Code provides that

> the court shall order the appointment of a trustee–for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor[.]

11 U.S.C. § 1104(a); *see Sillerman*, 605 B.R. at 641-42 (listing factors including "failure to comply with . . . the Bankruptcy Code," "failure to make required filings," "conflicts of interest," and "failure to discharge fiduciary duties").

54.     "[I]t is not necessary to delineate whether the cause consists of fraud, dishonesty, incompetence, gross mismanagement 'or similar cause'." *Savino Oil*, 99 B.R. at 527.  Rather, "any one of these causes within the penumbra of fiduciary neglect, as defined, mandates appointment of a trustee." *Id.*; *see also In re Cumberland Inv. Corp.*, 118 B.R. 3, 6-7 (Bankr. D.R.I. 1990) ("It is this pervasive, broad course of debtor misconduct which calls out for the appointment of a Trustee, to protect the interest of creditors of this estate, and possible future creditors.").  In addition, "[a] court may consider both the pre- and post-petition misconduct." *Ashley River,* 2015 WL 1540941, at *10; *see also In re Klaynberg*, 643 B.R. 309, 317 (Bankr. S.D.N.Y. 2022) (granting motion for appointment of trustee pursuant to section 1104(a)).

55.     Upon a showing of "cause" as under section 1104(a), appointment of a trustee is mandatory.  *See* 11 U.S.C. § 1104(a) ("the court *shall* order the appointment of a trustee . . .") (emphasis added); *Petit v. New England Mortg. Services Inc.*, 182 B.R. 64, 69 (D. Me. 1995) ("Indeed, some courts have read this section of the statute as *mandating* the appointment of a trustee when there are findings of the circumstances described in subsection (a)(1).").

16

56.     Furthermore, 28 U.S.C. § 959 proscribes that a debtor in possession "shall manage and operate the property in his possession . . . according to the requirements of the valid laws of the State in which such property is situated." 28 U.S.C. § 959(b). This provision reflects Congress's recognition that "[t]he mere fact that a debtor has filed for bankruptcy does not obviate the requirement that a debtor abide by applicable law. . . . [T]he automatic stay does not provide a debtor in bankruptcy with a *carte blanche* excuse to avoid health and safety regulations." *In re Cracked Egg, LLC*, 624 B.R. 84, 88-89 (Bankr. W.D. Pa. 2021).

57.     Because the Debtor has failed to remediate its multiple violations of the Building Code and City Ordinances, there is cause under section 1104(a) and 28 U.S.C. § 959(b) to appoint a trustee. *See In re Bayou Haven Bed & Breakfast, LLC*, No. 18-10570, 2018 WL 3956933, at *2 n. 11 ("Effectively with this Order, this Court is enforcing local ordinances by virtue of 28 U.S.C. § 959(b).").

58.     The Debtor has been on notice of the Project's violations for almost *five years*. During that time, and as delineated by the state court-appointed Receiver, the Project has become the subject of over 250 Building Code deficiencies.  Furthermore, as the Debtor admits, the Property is located in a "high-traffic area . . . directly adjacent to the Auburndale MBTA commuter rail stop." Amended Disclosure Statement, § 4.1.  The risk that such a derelict structure presents to commuters, the Property's neighbors and other constituents of the City is paramount. The Debtor's proven incompetence in addressing these deficiencies and rendering the Project safe is cause to appoint a trustee under section 1104(a). Indeed, the Debtor's "fiduciary neglect" of the Project *mandates* the appointment of a trustee. *See Petit*, 182 B.R. at 69.

59.     Moreover, the Debtor has operated with utter incompetence and dishonesty—both prior to and after the Petition Date.  As identified above, the Debtor has repeatedly failed to

17

maintain proper books and record, failed to make routine organizational filings, and failed to file tax returns for more than a decade. Even more concerning, the Debtor, through its manager (Donna Vona) and her husband (Stephen Vona), has been less than honest with this Court. *See supra*, ¶¶ 43 - 45. Such conduct fits squarely in the Bankruptcy Code's "cause" to appoint a chapter 11 trustee. 11 U.S.C. § 1104(a)(1).

## II. The Court Should Appoint a Trustee in the Interest of Creditors Under § 1104(a)(2).

60.     Section 1104(a)(2) directs that courts "shall" appoint a trustee when doing so would be "in the interests of the estate or its creditors[.]" *In re Adelphia Commc'ns Corp.*, 342 B.R. 122, 130 (S.D.N.Y. 2006); *see also In re The Bible Speaks*, 74 B.R. 511, 514 (Bankr. D. Mass. 1987) (noting appointment of trustee would provide "cohesive and full time direction of an experienced executive"). Section 1104(a)(2) is a "flexible standard and allows the appointment of a trustee even when no 'cause' exists." *In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990) (granting appointment of trustee).

61.     Rather than relying on "rigid absolutes" in an analysis under section 1104(a)(2), courts should "look to the practical realities and necessities of the record to determine whether the appointment of a trustee is in the best interests of the estate." *In re Taub*, 427 B.R. 208, 227 (Bankr. E.D.N.Y. 2010) (internal quotations omitted). Factors that courts may review include: (i) "the trustworthiness of the debtor"; (ii) the debtor's prospects for rehabilitation; (iii) creditors' lack of confidence in the debtor; and (iv) "the benefits derived from the appointment of a trustee, balanced against the costs of the appointment. *See Sillerman*, 605 B.R. at 651-52; *Ashley River*, 2015 WL 1540941, at *11. Here, all of those factors weigh in favor of appointing a trustee.

62.     First, the Debtor's pattern of behavior exhibits a lack of trustworthiness. As set forth above, the Debtor engaged in misconduct by failing to rectify the Project's violations pursuant to the Building Code and City Ordinances. In addition, the Debtor continued to do work

18

on the Project despite the City's warnings that the Project was unsafe for life and limb, which "casts doubt on the Debtor's trustworthiness." *See Ashley River*, 2015 WL 1540941 at *11 ("Here, based on [] prior fraud and misconduct that has continued through to the present . . . it is clear to this Court that the Debtors . . . are not trustworthy and do not deserve the confidence of their creditors.").

63.     Second, the Debtor lacks any prospects of reorganizing.  For years, the Debtor failed to finish construction on the Property to render it safe and suitable for habitation.  Now in bankruptcy, the Debtor has filed a Plan that is patently unconfirmable: Plan funding will depend entirely on the sale of the Property, which will be near impossible due to (a) the extreme derelict nature of the Project while under the Debtor's control, and (b) no benefit for unsecured creditors. *See Sillerman*, 605 B.R. at 655 (finding that "the prospects for rehabilitation do not appear to be favorable" where "[t]here is no concrete or reliable plan put forth by the Debtor for how to provide maximum recovery for estate creditors").

64.     Third, the Movants have no confidence in the Debtor's ability to effectively administer the estate.  *See id.* ("A trustee can be appointed based solely on the creditor's lack of confidence in the Debtor's ability to effectively administer the estate."); *In re Eurospark Indus., Inc.*, 424 B.R. 621, 630 (Bankr. E.D.N.Y. 2010) (appointing trustee where there was "the lack of trust in [the debtor's shareholder] by the parties with the greatest economic stake" and a "loss of confidence in [his] ability to administer the estate's . . . claims against [third parties] in the best interests of the estate").

65.     As stated above, the Debtor's First Amended Plan relies entirely on the sale of a property that it has spent years neglecting.  The Debtor has failed to remedy the neglect, and has no funds to complete the Project, and is premised on, among other speculative assertions, the idea

324802210v4

that the City's Proof of Claim will be disallowed. However, the purported sale contemplated in the Amended Plan is neither viable nor sustainable. Moreover, no offer has been received, which makes the Plan unfeasible. How reliable, then, is the First Amended Disclosure Statement which provides no clarification beyond an "agreement in principle with a ready, willing and able purchaser?" Specifically, the First Amended Disclosure Statement fails to refer to or summarize the conditions of the expected offer, or most meaningfully, its conditions which the City and Bank suspect, will include (1) impractical financing contingencies; (2) an excessive and unjustifiable due diligence period; (3) requirement of further zoning variances prompting likely challenges, hearings and appeals; and (4) highly speculative closing dates. Irrespective of having an agreement in principle the purchase price identified is not only insufficient to cover administrative costs of the estate and the secured claim of the Bank, but the timeline of the sale is extended beyond reasonableness for a chapter 11 case that has been pending for nearly six (6) months and can hardly be characterized other than as a single asset real estate case and a plan that fails to meet the heightened standard under section 362(d)(3) a plan that has a "reasonable possibility of being confirmed within a reasonable period of time." Clearly, the Debtor has made no legitimate progress in moving toward an exit from bankruptcy and ignores the true valuation the Receiver obtained which was provided to the Debtor, and which the Debtor fails to even acknowledge exists. Based on the Debtor's history of mismanagement, its misguided and cavalier attention to building safety requirements and its demonstrated lack of improvement to the Project, the Movants have no confidence that the Debtor is truly acting in the best interests of the estate or the creditors.

66.     Unquestionably, the benefits of a trustee far outweigh the costs. The Property's numerous Building Code and City Ordinance violations continue causing the estate to accrue fines with each day that passes, and with the Debtor filing a patently unconfirmable plan, there is no end

20

324802210v4

in sight. *See Ionosphere*, 113 B.R. at 170 (appointing trustee where creditors "are willing to risk the costs, uncertainties and dislocations, occasioned by the appointment of a trustee"); *Bellevue*, 171 B.R. at 625 ("[A] trustee is necessary to unfreeze this bankruptcy case and to permit and foster the negotiations between interested parties which generally occurs in bankruptcy cases.").

67. Finally, the actions of the Debtor's management are tainted with self-dealing, making its management ill-suited to continue operating the Debtor for the pendency of this proceeding. *See Petit*, 182 B.R. at 70 (appointing a trustee under § 11404(a)(2) where a debtor could not be "properly entrusted with the fiduciary duties of a trustee").

## **RESERVATION OF RIGHTS**

68. The Movants reserve any and all rights and remedies available to them under the Bankruptcy Code, the Bankruptcy Rules, and applicable law, including the right to seek injunctive relief and to pursue criminal proceedings against the Debtor.

## **CONCLUSION**

69. For the reasons stated herein, the City of Newton and Dedham Institution for Savings respectfully request that this Court enter an Order in the form attached hereto as **Exhibit A** appointing a chapter 11 trustee.

21

324802210v4

Dated: February 20, 2026

Respectfully submitted,

By: /s/ Hanna J. Redd
    Hanna J. Redd

**TROUTMAN PEPPER LOCKE LLP**
Hanna J. Redd (BBO #705222)
111 Huntington Ave., 9th Floor
Boston, MA 02199
Telephone: 617.239.0141
Fax: 888.325.9128
Email: hanna.redd@troutman.com

*Counsel to City of Newton*

*-and-*

By: /s/ Alan L. Braunstein
    Alan L. Braunstein

**RIEMER & BRAUNSTEIN LLP**
Alan L. Braunstein (BBO #546042)
100 Cambridge Street
Boston, MA 02114
Telephone: 617.523-9000
Fax: 617.880.3456
Email: abraunstein@riemerlaw.com

*Counsel to Dedham Institution for
Savings*

22

324802210v4

**CERTIFICATE OF SERVICE**

I, Hanna J. Redd, do hereby certify that on February 20, 2026, I caused a copy of the foregoing to be served through the Court's CM/ECF system, and that copies will be sent electronically to all registered participants, and that paper copies will be sent to those indicated as non-registered participants requesting notices as of the date hereof.

/s/ Hanna J. Redd
Hanna J. Redd

324802210v4

## Exhibit A

*Proposed Order*

324802210v4

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re: | ) |
| | ) Case No. 25-11733 |
| Turtle Lane LLC, | ) |
| | ) Chapter 11 |
| Debtor. | ) |

## ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE

Upon consideration of the *Joint Motion of City of Newton and Dedham Institution for Savings for an Order Appointing a Chapter 11 Trustee* [Docket No. •] (the "Motion"), and any objections thereto, and after notice and an opportunity for hearing, it is hereby ORDERED as follows:

1.       The Motion is GRANTED as set forth herein.

2.       Pursuant to 11 U.S.C. § 1104(a), that the U.S. Trustee shall, as soon as practicable, appoint a chapter 11 trustee.

_____
Christopher J. Panos
United States Bankruptcy Judge

324802210v4